# NATHANIEL S. BOUTON *et al.*

*v.*

# THE BOARD OF SUPERVISORS OF McDONOUGH COUNTY.

1. COUNTY—*can only act through board of supervisors.* The powers of a county, as a body politic, can only be exercised by the board of supervisors thereof, or in pursuance of a resolution by them adopted.

2. CORPORATIONS—*not bound by act of individual members.* Individual members of a corporation can not, unless authorized, bind the body by express promises; hence it follows, that a corporate engagement can not be implied from their unsanctioned conduct or declarations.

3. As corporations can be expressly bound only by joint and corporate acts, so it is only from such acts done, either by the corporation as a body, or by its authorized agent, that any implication can be made, binding it in law.

4. BOARD OF SUPERVISORS—*individual member can not bind county by his acts.* The supervisors have no power to act individually; it is only when convened, and acting together as a board of supervisors, that they represent and bind the county by their acts, and the chairman of the board has no greater authority, in his individual capacity, than any other member.

5. AGENTS—*unauthorized acts of, do not affect public corporations.* Where the officers or agents of a public corporation have no power with respect to a given matter, neither their acts nor their individual knowledge in respect to the matter, can in any way bind or affect such corporation.

6. SAME—*acts of public, governed by rule different from those of private.* Whilst, in many cases of mere private agents, the principal is bound by declarations and representations made by his agent without authority, in cases of public agents the government or other public authority is not bound, unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out as having authority to do the act, or is employed in his capacity as a public agent to make the declaration or representation for the government.

7. Where the board of supervisors of a county make a contract with a builder to build a court house, for which he is to be paid eighty-five per cent as the work progresses, on monthly estimates, upon the certificate of the superintendent of the building employed by the county, fifteen per cent to be reserved until the completion of the work, the county is not bound by any arrangement made between such builder and superintendent and a subcontractor, which is at variance with the terms of the original contract.

8. MECHANIC'S LIEN—*applies only to property subject to be sold under execution.* The Mechanic's Lien Law is framed with reference to such

property as is subject to be sold under execution, and as to such property as is exempted by law from sale on execution the lien is incapable of enforcement, and its provisions, as respects such property, are nugatory and entirely inapplicable.

9. Same—*court house not subject to.* A court house does not come within the provisions of the Mechanic's Lien Law, and no such lien can attach thereto.

10. Same—*separate personal decree not contemplated by the lien law.* The Mechanic's Lien Law does not contemplate any such thing as a personal decree alone. The decree rendered may operate as such, so far as respects any deficiency after there has been a sale upon execution of the property subject to the lien, and it fails to satisfy the amount found due.

Appeal from the Circuit Court of McDonough county; the Hon. C. L. Higbee, Judge, presiding.

Messrs. Waite & Clarke, for the appellant.

Messrs. Judd & Whitehouse, for the appellee.

Mr. Chief Justice Sheldon delivered the opinion of the Court:

This was a bill in chancery, filed by N. S. Bouton & Co., the appellants, against the board of supervisors of McDonough county, to enforce an equitable assignment, or a sub-contractor's lien. Bouton & Co. were sub-contractors under A. Wallbaum & Co., who were contractors with the county for the building of a court house at Macomb, in said county. For that purpose, on February 11, 1869, Wallbaum & Co. made with said board, on behalf of the county, an agreement in writing for the erection of the court house, to be completed on or before August 11, 1870, for the price of $129,000, to be paid to them as the work should proceed, as follows: "Eighty-five cents on each dollar's worth of work or materials furnished and in the building, the money to be paid in monthly estimates on the first day of each month, upon the certificate of the superintendents." E. E. Myers was named as the architect, and the work was to be done according to plans, specifications, etc., furnished by him. Myers and S. G. Reid were, by the contract, made the superintendents of the building.

Wallbaum & Co. performed the contract, but not within the time limited, with the exception of some $3657, which Ried, the superintendent, under the direction of the board of supervisors, paid out to fully complete the court house.

In January, 1870, N. S. Bouton & Co. made a sub-contract with Wallbaum & Co., to furnish certain materials and work, for about $25,794, which was performed, and on which they were paid only $8059, leaving $17,734 still due, which they here seek to recover from the county. The court below, upon final hearing on proofs, dismissed the bill, and the complainants appealed to this court.

The right of recovery is based on three grounds:

First, that of an equitable assignment made by Wallbaum & Co. to Bouton & Co., and accepted of or assented to by the county, through its superintendents, on October 21, 1870.

Second, that of an order or estimate for $8196, drawn or assigned by Wallbaum & Co., in favor of Bouton & Co., and accepted or assented to by the county, through its superintendents, about January 1, 1871.

And, third, that of a sub-contractors' lien in favor of Bouton & Co.

As respects the first ground, it appears that in August, 1870, Bouton & Co., becoming dissatisfied as to payments, examined into the affairs of Wallbaum, and found that he had no partner in the business, and that he was insolvent and in bankruptcy; and on the 12th of October, 1870, they caused a written notice to be served on the treasurer of the county of their being sub-contractors, and that they should, under the lien law, hold the county responsible for the payment of any sum due them. Myers and Reid, the superintendents, had knowledge of the notice. On October 21, 1870, a meeting took place between N. S. Bouton, Wallbaum, Reid and Myers, and an arrangement was had; what it was, the testimony is conflicting; but we will assume Bouton's version of it to be the correct one. He says that he declined to do any more work unless he could be paid, and an arrangement made by which payment should come to him directly; that thereupon

an arrangement was made that Reid and Myers should give Bouton & Co. monthly estimates directly, for their work, and the payments were to be made by the county directly to them; that they were to pay Bouton & Co. only eighty-five per cent, at the time, of the amount of their bills, and they were to retain the fifteen per cent, provided for in their contract with Wallbaum, and that the fifteen per cent was to be retained until the completion of their work, when it was to be paid to them; that he consented, on this basis, to go on with the remainder of the work. After this arrangement, Bouton & Co. furnished and put into the building from $15,000 to $18,000 of work and material. Had this arrangement been carried out strictly, Bouton & Co. would have been paid. If the county itself had made this agreement a very strong case of equity would be exhibited. It is presented in argument, all through, as though the county was a party to the arrangement, through its superintendents. Therein consists the defect.

We consider the arrangement as one which it was not within the scope of the authority of Reid and Myers to make, and that it was not binding upon the county. The contract for building the court house was not made by them, but by the board of supervisors of McDonough county. Reid and Myers were but superintendents of the construction of the building, to see that it was built according to the contract which had been made by the board of supervisors. All the authority given by the contract to Myers and Reid, the superintendents, was to accept or reject any materials or work furnished, and to issue the certificates for the work and materials done and furnished, and upon such certificates, by the resolution of the board of supervisors, the county clerk was directed to issue court house orders, in favor of Wallbaum & Co., for such sums of money as they might be entitled to in accordance with the terms of the contract. The board's resolution of appointment of Reid was, " as county agent to superintend the construction of the court house."

Reid and Myers had nothing to do with the disbursement

of funds, and it was not their's to say when, to whom, or how much, money should be paid.  In respect, then, of this transaction of October 21, 1870, Reid and Myers were not the authorized agents of the county, or either of them, and they must be regarded as speaking for themselves, as to whatever they might do in virtue of the authority vested in them.  They did not speak for or bind the county.

It appears that, at the suggestion of Myers, Bouton & Co. made out an account of the amount due to them for work done up to January 1, 1871, which was $8,196; that upon it Wallbaum made the following indorsement:

"Messrs. E. E. Myers and S. G. Reid:

"*Gentlemen*—If you find the work done by Messrs. N. S. Bouton & Co. to be done all right and satisfactory to both parties, you will please give him an order on the county treasurer for paying this bill.        A. Wallbaum."

That Myers indorsed upon it his approval; that on its presentation to Reid, he refused to indorse his approval, saying the board of supervisors had passed a resolution that no money should be paid to Wallbaum in excess of the eighty-five per cent of his contract, and that was about paid; that it was then ascertained what the balance of such eighty-five per cent was, and it was found to be $1019, leaving a balance of fifteen per cent of the contract price of $129,000, amounting to about $19,000.  Bouton & Co. obtained from Wallbaum a separate order for the payment to them of this sum of $1019, which Reid subsequently paid to them, and this was all the payment ever made to them by the county.

There is a conflict in the testimony of Bouton and Reid as to what took place between them on the presentation of this estimate for $8196, on which was Wallbaum's indorsement as above.  We will, as before, accept the testimony of Bouton in regard to it.  He says that Reid figured up this balance of fifteen per cent, and assured him that there would be money enough to pay Bouton & Co. their bill when the work was done, and that it could not be paid out for any other purpose,

and that he would pay all their account.  He says he retained the estimate itself, at Reid's request, and that it was burned in the great fire in Chicago, of October, 1871.  Bouton & Co. continued on to the completion of their contract, and must have done considerable work subsequent to this time, January 1, 1871.

The eighty-five per cent of the contract price was exhausted by the payment of the $1019 to Bouton & Co. at this time, in January.  This sum is all that was then due under the contract of Wallbaum & Co., and the remainder, the reserved fifteen per cent, would not become due until the final completion of the contract.  This fifteen per cent was so reserved as security to the county for the completion of the court house, and in order that the county might use the amount to complete the work if Wallbaum & Co. failed to comply with their contract.  Certainly, it is not to be supposed that Myers and Reid had any authority, by the arrangement of October 21, 1870, to encroach upon this reserve of fifteen per cent, and divert it, in whole or in part, to the use of Bouton & Co., and thus work such a material change in the contract, which provided for the holding of the whole of this reserve fund, by the county, intact, until the full completion of the contract.  It would seem that the whole of this reserved fifteen per cent was needed, and that the county itself did really make use of the whole of it in the completion of the building.  In March, 1871, three of the sub-contractors, who had sub-contracts under Wallbaum & Co. for doing portions of the work, became dissatisfied, on account of the uncertainty of getting their pay from Wallbaum & Co., and, to some extent, had already quit their work, and were threatening to do so entirely, unless the county would secure their pay.  In view of this, Wallbaum & Co., on March 13, 1871, drew three several orders on the board of supervisors, for the payment to Martin & Thomas, of the sum of $12,087; to B. F. Whitson & Co., $1500; to Ingraham & Argenbright, $2150, for work already done and to be done, which the board of supervisors, on the same day, in due form, accepted, one-half payable then and the other half when Wall-

baum & Co. should complete their contract. These sub-contractors then went on and completed the work under their contracts. At last, before its final completion, Wallbaum & Co. abandoned the work, and the county paid out the sum of $3654 to finish the building. This sum, together with the amounts of said orders accepted by the board of supervisors, entirely exhausted the amount of fifteen per cent of the contract price.

Bouton & Co. appear to have done between $4000 and $5000 of work after March 13, 1871. It is especially complained of by Bouton & Co., as unfair toward them, that the county should have by these orders paid these other three sub-contractors for work which had already been done by them previous to March 13, 1871, and leave them, Bouton & Co., unpaid. There would not seem to have been a very large amount of previous work paid for by the orders. Thomas, of the firm of Martin & Thomas, says the value of the work and materials they put into the building, after the acceptance of their order, was about $12,000; Whitson, that about three-fourths of his $2500 job was done at that time, and Ingraham, of the firm of Ingraham & Argenbright, that they, afterward, did work to the amount of from $1500 to $1800, which would make, in all, some $1500 of previous work which was thus paid for.

But the payment for this previous work might have been needed to enable the sub-contractors to go on and carry out their contracts, and, at any rate, they might have exacted it as a condition of going on with their contracts; and it may be fairly understood, from the evidence, that they did, as they testify, each one, that they would not have gone on with their contracts unless the board had accepted their orders. If, then, the payment for this previous work was necessary, in order to secure the performance of these sub-contracts, Bouton & Co. have no rightful cause of complaint on account of the payment of it out of this reserved fifteen per cent, as it was for just such a purpose, of securing the completion of the work if Wallbaum & Co. failed, that it was reserved; and they had no just reason to believe that Myers and Reid, by anything

they might say or do, could encroach upon and divert it from such use, in their favor.

Bouton & Co. complain of a payment of $10,000 which was made by the county to Wallbaum & Co., in November, 1870, and after the arrangement of October 21, 1870, as being wrongful and in violation of that arrangement.   On the day following that arrangement, an "original estimate" was filed with the county clerk, as shown by the record, amounting to $23,316. This estimate, as we understand, embraced work and materials before then furnished by Bouton & Co., to the amount of $14,497, on which they received $11,759, on the next day, according to agreement between the parties.   The balance of this estimate was for work done by Wallbaum & Co., out of which they drew this $10,000, as they had a right to do.

This estimate, as we regard it, was not covered by the terms of the "arrangement," or "equitable assignment," of October 21, 1870, and Bouton & Co. can have no right to complain of the $10,000 payment to Wallbaum & Co. as any way in interference therewith.

It is urged that that portion of the reserve of fifteen per cent paid to these other three sub-contractors was not expended by the county in completing the building after Wallbaum had failed, as these sub-contractors went on, under their original sub-contracts, to their completion, and not under any new contract or employment by the county; but if these sub-contractors would not have gone on further with their contracts unless the county would pay these orders—and it was only in consequence of the county agreeing to pay them, that they did go on, and completed their work—then, as affecting the question in hand, it was the same as if Wallbaum & Co. had wholly abandoned the work, and the county had itself made new contracts for the performance of the work, and made the payments under such new contracts.   It was money which the county, through failure of Wallbaum & Co., had to pay out to secure the completion of the building.

Giving, then, to what took place October 21, 1870, and in January, 1871, with respect to the order for $8196, all that is

claimed therefor, as being equitable assignments of a portion of this court house fund, we find that it has all been rightfully exhausted, and that there is nothing to which the supposed "equitable assignments" could attach. All of the eighty-five per cent of the fund which Wallbaum & Co. were entitled to receive after October 21, 1870—aside from the $10,000 paid Wallbaum & Co., in November, which, as we have remarked, was not within the purview of the arrangement of October 21 —was received by Bouton & Co., in January, 1871, to-wit: $1019. This exhausted all of the eighty-five per cent. As to the remaining reserved fifteen per cent, Wallbaum & Co. never became entitled to receive any part thereof under the terms of their contract, it all having been expended by the county for the completion of the building after the failure of Wallbaum & Co. in the completion of their contract, within the fair contemplation of the agreement with the board of supervisors.

We have considered the case thus far with reference to any such agreement or arrangement as might have been made by Myers and Reid, in consistency with the agreement made between the board of supervisors and Wallbaum & Co. for the building of the court house. Myers and Reid had no authority to vary the terms of that agreement in any respect, and anything they may have said or done inconsistent therewith, was beside the authority given them, and can not bind the county.

"The powers of a county, as a body politic, can only be exercised by the board of supervisors thereof, or in pursuance of a resolution by them adopted." Laws 1861, p. 236, sec. 4, art. 13.

As a general rule, corporations can only bind themselves by a corporate vote, or by an agent duly authorized to act for them. It is said in Ang. and Ames on Corp. sec. 239, "that, since individual members of a corporation can not, unless authorized, bind the body by express promises, neither can any corporate engagements be implied from their unsanctioned conduct or declarations. As corporations can be expressly bound only by joint and corporate acts, so, it is only from such

acts, done either by the corporation as a body or by its author-
ized agents, that any implication can be made binding it in
law." And see *Harrington* v. *School District*, 30 Vt. 156;
*Hayden* v. *Turnpike Co.* 10 Mass. 405.

Some stress is laid upon an alleged overpayment made to
Wallbaum & Co. previous to Oct. 21, 1870, in excess of the
eighty-five per cent he was entitled to receive on work done,
claimed as being some $15,000. It is said, that in consequence
of this, Bouton & Co. received so much less than they other-
wise would have been entitled to receive under the arrange-
ment of October 21, and this is supposed to afford some ground
of relief. This overpayment is dwelt upon, as in violation of
the court house contract, as a wrongful act, and that it should
have been disclosed by Reid and Myers. It is a singular mis-
application of terms, to style this a wrongful act. At the
time it was done, it was a matter between the county and
Wallbaum alone, concerning no one else, and any wrong there
was could have been only toward the county itself. If it be
regarded that there was any duty upon Reid and Myers to have
disclosed such overpayment, it concerned them alone, and was
not one resting upon the county, as they were not agents of
the county to act in such matter. And this remark may be
applied to the asserted claim of an equitable estoppel against
the county, as arising from the failure to disclose this over-
payment, as well as from other acts and declarations of Reid and
Myers, whereby Bouton & Co. were induced to act to their
injury.

We see therein no foundation for any claim of such estoppel,
as they were not the conduct, acts and declarations of the
county or its authorized agents in that regard. It might
have been otherwise, and as appellants claim, had Reid and
Myers been themselves the principals, or if they had had au-
thority from the county to act in the premises, and make the
promises and assurances which it is testified they did make.

Whatever might have been the reliance of Bouton & Co.
upon what took place with respect to the order for $8196 of
Jan. 1, 1871, it was with the distinct information from Reid

that he could not indorse it, because the board of supervisors had passed an order that no money should be paid Wallbaum in excess of the eighty-five per cent of his contract, and that the $1019, then paid to him, was the full exhaustion of that per cent. They, doubtless, went on and performed their contract, under the encouragement from Reid that they would finally be paid out of the remaining reserved fifteen per cent, it amounting to some $19,000. It is a seeming hardship that Bouton & Co., who happened to be non-resident sub-contractors, living in Chicago, should go unpaid, when three other resident sub-contractors, through an arrangement subsequently made, secured from the county the pay for not only their future work, but for some previous work. But this was owing to their superior vigilance in going to the board of supervisors themselves—the body authorized to act for and bind the county —and obtaining from them an absolute agreement to pay for such work, by their acceptance of orders for payment of its amount. Had Bouton & Co. adopted the same precaution, they would have been paid also. The county have paid the full contract price of $129,000 for the building of the court house, and it would be unjust to the county to require it to pay the further sum here claimed beyond such contract price.

The county itself did not, by any authorized agent, hold out any inducement to Bouton & Co. to proceed in the execution of their contract, under assurance of being paid by the county. There is no proof whatever, either, of the county having notice of any such inducement or assurance from Reid and Myers, or either of them, further than might be supposed to arise from the fact of their position as superintendents, and from the position of Reid as chairman of the board of supervisors. But those mere circumstances alone, we conceive, furnish no proof of such notice to the county.

Reid appears to have been chairman of the board of supervisors for the year ending March, 1871. But this gave him no additional authority. This position, we understand, merely made him the presiding officer in meetings of the board of supervisors, giving him otherwise no superior power above any

other member of the board. The supervisors have no power to act individually. It is only when convened and acting together as a board of supervisors, that they represent and bind the county by their acts. Where the officers or agents of a public corporation have no powers with respect to a given matter, we regard the rule to be, that neither their acts nor their individual knowledge in respect to the matter can, in any way, bind or affect such corporation. *Bank of Pittsburgh* v. *Whitehead et al.* 10 Watts, 397; *The President, etc.* v. *Cornen,* 37 N. Y. 323; Ang. & Ames on Corp. §§ 307, 308; *Harrington* v. *School District, supra.*

Different rules prevail in respect to the acts and declarations of public agents, from those which ordinarily govern in the case of mere private agents. As to the latter, the principals are, in many cases, bound, where they have not authorized the declarations and representations to be made. But, in cases of public agents, the government or other public authority is not bound, unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out as having authority to do the act, or is employed, in his capacity as a public agent, to make the declaration or representation for the government. Story on Agency, § 307 a; *Whiteside* v. *United States,* 93 U. S. 247; and see *The People* v. *Brown,* 67 Ill. 435.

The further and last ground of claim, is that of a mechanics' lien on the court house property, as sub-contractors. By statute, an execution can not issue "against the lands or other property of any county of this State." Rev. Stat. 1845, p. 133, § 20. And in *City of Chicago* v. *Hasley,* 25 Ill. 595, this court decided, that an execution could not be issued against a municipal corporation on a judgment for debt or damages recovered against it; that the only legal mode to enforce payment was by *mandamus* to compel payment, or to compel a levy of taxes for the purpose. The Mechanic's Lien Law is framed with reference to such property as is subject to be sold under execution. The method which it provides for the enforcement of the lien it gives, is by sale upon execution of the

property to which the lien attaches, for its satisfaction. As to property which is exempted by law from sale on execution, the Lien Law is incapable of enforcement, and its provisions, as respects such property, are nugatory, and are entirely inapplicable.

We hold that the property in question does not come within the purview of the Mechanic's Lien Law, and that no such lien can attach thereto. A like decision, with reference to such property, was made in *Wilson* v. *Commissioners of Huntington Co.* 7 Watts & Serg. 197. In *Board of Education* v. *Neidenberger*, 78 Ill. 58, such a lien was held not to attach to a school house.

The suggestion is made, that the court may, in such case, apply and carry out the provisions of the Lien Law so far as to pass a decree for the money due, and stop with that, not ordering any sale of the property. But the statute does not contemplate that there shall be any such thing as a personal decree alone. The decree rendered may operate as such, so far as respects any deficiency, after there has been a sale upon execution of the property subject to the lien, and it fails to satisfy the amount found due. The statute, by all its provisions, is only intended to apply and have operation as respects property which may be and is to be sold on execution.

We can not mould the statute to subserve a purpose for which it was never designed.

Finding no sufficient cause to disturb the decree, it is affirmed.

*Decree affirmed.*